UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| WILLIAM D. BROWN III, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>CAROLYN W. COLVIN,[1] )<br>Commissioner of Social Security, )<br>)<br>Defendant. ) | No. 4:12 CV 615 DDN |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the applications of plaintiff William D. Brown III for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401, et seq., and for supplemental security income under Title XVI of that Act, 42 U.S.C. §§ 1381, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the decision of the Administrative Law Judge is affirmed.

## I. BACKGROUND

Plaintiff William D. Brown III, born April 21, 1987, filed applications for Title II and Title XVI benefits on January 8, 2010. (Tr. 147-54.) He alleged an onset date of disability of February 1, 2009, due to bipolar disorder, attention deficit hyperactivity disorder, depression, schizophrenia, and arthritis in the hands, shoulders, and knees. (Tr.

---

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security. The Court hereby substitutes Carolyn W. Colvin as defendant in her official capacity. Fed. R. Civ. P. 25(d).

179.) Plaintiff's applications were denied initially on April 9, 2010, and he requested a hearing before an ALJ. (Tr. 87-93.)

On September 7, 2011, following a hearing, the ALJ found plaintiff not disabled. (Tr. 10-24.) On January 31, 2012, the Appeals Council denied plaintiff's request for review. (Tr. 1-3.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL HISTORY

Plaintiff repeated the second grade. On March 2, 2000, the Winfield R-4 School District recommended that plaintiff continue during sixth grade in an individualized education program for reading comprehension. His standardized test results for reading comprehension and language arts skills were in the bottom tenth percentile. His reading comprehension struggles affected other learning areas. His school records indicate that he did not advance beyond ninth grade. (Tr. 261-91.)

On February 2, 2008, plaintiff arrived at the emergency room and complained of sharp chest pain that radiated to his left arm and shoulder. The pain began three weeks earlier and occurred intermittently. Movement and deep breaths exacerbated the pain. Chest X-rays revealed no abnormalities. Brian Brown, M.D., diagnosed chest wall pain and prescribed Motrin and Vicodin for pain. (Tr. 324, 335-39.)

On February 8, 2008, plaintiff arrived at the emergency room and complained of recurring low back pain that radiated to his legs. Timothy McCullough, M.D., diagnosed low back strain and prescribed Ultram for pain. (Tr. 331-34.)

On June 20, 2008, plaintiff arrived at the emergency room and complained of pain in the right shoulder and mid back. He reported that he heard his right shoulder pop after lifting a garbage can filled with metal at work. Raisa Lev, M.D., found X-rays of the right shoulder and thoracic spine unremarkable. Pamela Westerling, M.D., diagnosed right shoulder and thoracic strain. (Tr. 323, 327-30.)

On July 31, 2009, plaintiff complained of anxiety, panic attacks, and auditory hallucinations. John Foxen, M.D. found that plaintiff suffered the symptoms of a major depressive episode. Plaintiff also reported previous diagnoses of schizophrenia and attention deficit hyperactivity disorder (ADHD) and hospitalization for suicidal depression. Dr. Foxen assessed hallucinations, unspecified anxiety state, and ADHD. He prescribed Symbyax, opined that plaintiff suffered from bipolar disorder, and referred plaintiff to psychiatry.[2] (Tr. 299-302.)

On August 13, 2009, plaintiff reported an improved mental state but that he continued to experience anxiety, manic episodes, and difficulty sleeping. He reported that Symbyax helped but caused vomiting and that his mind continued to race. He complained of dull pain in both hands and suggested arthritis. Dr. Foxen assessed low back pain, ADHD, bipolar disorder, and type II diabetes mellitus with neurological manifestations. (Tr. 295-98.)

On October 7, 2009, plaintiff complained of knee pain that began two years earlier and requested Percocet for pain. He further complained of shoulder pain. He reported that Symbyax improved his mood but that he continued to hear voices. Dr. Foxen noted that plaintiff recently obtained Medicaid coverage and prioritized psychiatric referral. He assessed bipolar disorder, psychotic disorder with hallucinations, lumbago, and bilateral knee pain.[3] (Tr. 313-15.)

On October 14, 2009, plaintiff reported that he no longer heard voices due to Lamictal.[4] He also reported that his pain had lessened. (Tr. 310-12.)

---

[2] Symbyax is used to treat certain mental or mood disorders, including depression. WebMD, http://www.webmd.com/drugs (last visited on September 12, 2013).

[3] Lumbago is pain in the mid and low back. Stedman's Medical Dictionary, 1121 (28th ed., Lippincott Williams & Wilkins 2006) ("Stedman").

[4] Lamictal is used to prevent seizures and extreme mood swings of bipolar disorder. WebMD, http://www.webmd.com/drugs (last visited on September 12, 2013).

On November 25, 2009, Suresh Kumar Krishnan, M.D., evaluated plaintiff for chronic pain. Plaintiff reported that his pain began five or six years earlier and rated his pain as 10 of 10. He also reported that the pain prevented sleep in intervals greater than two hours. He reported a motor vehicle accident in 2002. Dr. Krishnan diagnosed myalgia and myositis and referred plaintiff to rheumatology.[5] (Tr. 320-21.)

On December 4, 2009, plaintiff received an assessment for intensive outpatient program. He reported hearing voices that told him to harm himself and others, anger, anxiety, depression, and pain in the back and knees. He reported that his mother suffered mental health issues, that his grandparents raised him, and that two cousins molested him sexually from ages six to thirteen. Larina J. Ditto, LCSW, recommended his admission to the program for four weeks. (Tr. 405-13.)

On December 8, 2009, Paul B. Simon, D.O., evaluated plaintiff. Plaintiff reported that he received treatment for ADHD at age six and attended speech and reading classes for the learning disabled. He reported that he did not know his father until age seventeen and that his cousin molested him sexually for years. He reported an inpatient stay at age sixteen and that his mother suffered bipolar disorder and schizophrenia. Dr. Simon found that plaintiff described posttraumatic stress disorder symptoms from trauma and parental neglect. He also reported a conflict with his fiancée's brother three weeks earlier that caused him to attempt suicide by hanging. He indicated that he had lived with his fiancée for two months and that she might be pregnant. Dr. Simon assessed schizoaffective disorder and ADHD, gave him a GAF score of 30, and recommended his admission to an intensive outpatient program.[6] He prescribed Seroquel.[7] (Tr. 375-79.)

---

[5] Myalgia is muscle pain. Stedman at 1265. Myositis is muscle inflammation. Id. at 1275.

[6] A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worse of the two components.

On December 17, 2009, plaintiff reported moodiness and irritability and described his father as a former gang member and volatile. Dr. Simon increased the Seroquel dosage and found that plaintiff continued to require intensive outpatient services. He ruled out the possibility of malingering. (Tr. 380-83.)

From December 4, 2009 to January 20, 2010, plaintiff attended eleven group therapy sessions. He arrived on time, participated in discussion, and complied with his medication. (Tr. 389-413, 421-27.)

On April 9, 2010, Marsha Toll, Psy.D., submitted a Psychiatric Review Technique form regarding plaintiff. She found that he suffered the medically determinable impairments of ADHD, hallucinations, schizoaffective disorder, and anxiety. She also found that he suffered mild restriction of daily living activities, and mild difficulties maintaining concentration, persistence, and pace. She concluded that his impairments were not severe. (Tr. 436-47.)

On May 26, 2010, plaintiff complained of constant, sharp left shoulder pain that was made worse with movement. He also complained of asthma and a cough. Plaintiff reported that he smoked half a pack of cigarettes per day and had smoked for five years. Dr. Foxen assessed asthma, left shoulder pain, and psychotic disorder with hallucinations. (Tr. 452-54.)

On June 29, 2010, plaintiff reported that his asthma symptoms improved and that his new inhaler worked. He also stated that he decreased his tobacco intake to six cigarettes per day. Dr. Foxen prescribed Qvar and Albuterol for asthma. (Tr. 455-57.)

---

On the GAF scale, a score from 21–30 indicates behavior that is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 32–34 (4th ed. 2000) ("DSM-IV").

[7] Seroquel is used to treat certain mental or mood conditions, including bipolar disorder and schizophrenia. WebMD, http://www.webmd.com/drugs (last visited on September 12, 2013).

On August 21, 2010, plaintiff received a left wrist X-ray, which revealed a mild negative ulnar variance. (Tr. 498.)

On October 25, 2010, plaintiff complained of persistent, sharp, burning pain in the low back, left wrist, hands, and knees. Dr. Foxen assessed arthritis, fatigue, and psychotic disorder with hallucinations. He further recommended blood work and X-rays for arthritis and further psychiatric care. (Tr. 480-82.)

On November 8, 2010, plaintiff received X-rays on both hands. Eugene Beal, Jr., M.D., found old healed fractures on the distal right fifth metacarpal and distal phalanx of the right index finger. (Tr. 497.)

On December 6, 2010, plaintiff complained of pain in the low back, shoulders, hands, hips, and knees, which he rated as 9 of 10. He reported that movement and cold or rainy weather exacerbated the pain. Cassandra Lutes, APRN, FNP, BC, assessed low back pain and hand joint pain. She prescribed Depo-Medrol, Naproxen, and Flexeril and ordered an X-ray of the lumbar spine.[8] She also instructed plaintiff to wear gloves outside and perform finger exercises to retain mobility. (Tr. 476-79.)

On December 10, 2010, plaintiff received lumbar spine X-rays. Dr. Beal suspected pars defects at L5 but found no evidence of spondylolisthesis.[9] (Tr. 496.)

On January 4, 2011, plaintiff complained of constant, sharp right arm pain that radiated to his fingers. He stated that movement and lifting exacerbated the pain, which he rated 10 of 10. Marrietta Graham, APRN, FNP, BC, assessed acute shoulder joint pain

---

[8] Depo-Medrol is used to treat the pain and swelling that accompanies arthritis and other joint disorders. WebMD, http://www.webmd.com/drugs (last visited on September 12, 2013). Naproxen is used to relieve pain. Id. Flexeril is used short-term to treat muscle spasms. Id.

[9] A pars defect is a defect of a vertebra of the lumbar spine that is a precursor of spondylolisthesis. See http://livehealthy.chron.com/pars-defect-lumbar-sping-1040.html. Spondylolisthesis is the forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it or on the sacrum. Stedman at 1813.

and acute impingement with bursitis or tendonitis. His prescriptions included Ultram, Naproxen, and Robaxin.[10] (Tr. 472-75.)

On June 21, 2011, after the hearing before the ALJ, Karen A. MacDonald, Psy.D., performed a clinical psychological evaluation on plaintiff, then age 24. Plaintiff reported the following. His medications include Depakote and Trazodone.[11] He has nightmares, which Trazodone exacerbates. He suffers anger episodes and homicidal thoughts. He also has suicidal thoughts and hallucinates animals, including black animals with red, angry eyes, and his Native American ancestors. He completed the ninth grade, and his grandparents raised him. He fears his grandfather's death. His cousin abused him sexually from ages five to thirteen. He worked with Bodine for a year and a half and attempted to work at a cookie factory. He also worked for Earthwise but took medical leave in February. He awakens at 7:00 a.m. He lives with his wife, stepson, and infant daughter and spends most of the day caring for his daughter. He and his wife perform household chores, including cooking and laundry. His appetite is erratic, and his sleep is poor. (Tr. 504-05.)

Dr. MacDonald found that plaintiff suffered severe mood swings, odd, eccentric behaviors, and magical thinking. She noted his full scale IQ score of 76, which he obtained in 2009. She found his delayed auditory memory and ability to recall detailed instructions impaired and his abstract motor speed and pace somewhat impaired. She diagnosed bipolar I disorder with psychotic features, posttraumatic stress disorder, borderline intellectual functioning, and schizotypal personality disorder and gave him a GAF score of 45 to 50.[12] She found him capable of managing funds. (Tr. 505-06.)

---

[10] Robaxin is used to treat muscle spasms and pain. WebMD, http://www.webmd.com/drugs (last visited on September 12, 2013).

[11] Depakote is used to treat seizure disorders and certain psychiatric conditions and to prevent migraine headaches. WebMD, http://www.webmd.com/drugs (last visited on September 12, 2013). Trazodone is used to treat depression. Id.

[12] A GAF score from 41 to 50 represents serious symptoms (such as thoughts of suicide, severe obsessional rituals, frequent shoplifting), or any serious impairment in social,

Dr. MacDonald also submitted a Medical Source Statement of Ability to Do Work-Related Activities (Mental) form regarding plaintiff. She found that plaintiff suffered marked impairment with understanding, remembering, and performing complex instructions and the ability to make complex work-related decisions. She further found that his impairments affected his ability to interact appropriately with supervisors, coworkers, and the public and his ability to respond to changes in routine work settings due to homicidal and suicidal thoughts, anger outbursts, and auditory and visual hallucinations. She further indicated that she examined him in 2009 and 2010. (Tr. 501-02.)

**Testimony at the Hearing**

The ALJ conducted a hearing on May 12, 2011. (Tr. 51-82.) Plaintiff testified to the following. Plaintiff is age twenty-four, married, and lives with wife, daughter, and stepson in an apartment on the first floor of the building. He measures five feet, eight inches, and 140 pounds. He possesses a driver's license and is left-handed. He took the driver's license test three times before passing. He finished the eighth grade and started the ninth grade. He took special education courses throughout school. He attempted to obtain his GED. (Tr. 55-57, 77.)

He last worked in January 2010 at a workshop. He tore pages from books and removed labels from cans. He worked four days per week and eight hours per day. His employers paid him one dollar per hour. He also worked on an assembly line in 2008 for two or three months. He quit because of back pain and the frustration caused by the number of people around him. Additionally, he worked fulltime as a janitor for about a year in 2007 and 2008. He filed a worker's compensation claim, which was denied. He searched for further employment, but no one hired him. (Tr. 57-59, 63.)

---

occupational, or school functioning (such as the inability to make friends or keep a job). DSM-IV at 34.

He suffers from arthritis in the knees, hands, elbows, and shoulders and a fractured vertebrae in the low back at L7. X-rays from 2002 and 2010 revealed his fractured vertebrae. His physical conditions affect his ability to stand and walk. Sitting causes back pain. Lifting and carrying cause him difficulty. Dr. Foxen informed him that bipolar disorder and schizophrenia cause his arthritis pain. He first met with Dr. Foxen in 2008 and saw him once per month. Dr. Foxen prescribed medications but moved in June 2010. Plaintiff currently sees nurse practitioner Lutes every three months. For his worker's compensation claim, he received an evaluation from a doctor. He received physical therapy. Dr. Foxen instructed him to avoid lifting objects over fifty pounds. (Tr. 59-63.)

He takes Ultram and Robaxin for pain. The medications partially alleviate his pain but cause drowsiness. Although he received instructions to take them three times per day, he only takes them at night, because his medication prevents him from functioning during the day. (Tr. 64.)

On a typical day, he awakens at 7:00 a.m. and prepares his stepson for school. Around 8:00 a.m., he walks his stepson to school, which is about two blocks away from his apartment. At 8:30 a.m., he returns to his apartment after sitting with his stepson at breakfast. He changes his infant daughter and feeds her. Then, for the rest of his day, he cleans his house and washes dishes. His wife stays at home during the day. He and his wife eat lunch around 12:30 p.m. Occasionally, they prepare lunch. After lunch, he performs yard work. He begins preparing dinner around 4:30 p.m. and eats at 6:00 p.m. After dinner, he washes dishes and plays board games with his stepson. He sends his stepson to bed around 8:30 p.m. Afterwards, he lies on his bed to relax. Care for his daughter intermittently interrupts his rest. He goes to bed at 11:30 p.m. He can dress, shower, and wash his hair. He occasionally shops for groceries. He launders, sweeps, and vacuums. He enjoys fishing and walking. Occasionally, handling money causes him difficulty. (Tr. 65-67, 77-78.)

His psychological conditions include ADD, ADHD, bipolar disorder, schizophrenia, and chronic depression. He received treatment and medication for ADHD

at age thirteen.  He also suffers anxiety, which causes shakiness, dizziness, and fainting. His last anxiety attack occurred two months earlier after receiving unfavorable information about his grandfather's health.  He scheduled an appointment with a psychiatrist in June.  In 2002, he attempted to hang himself in a locker room.  Sexual abuse, his brother moving away, bullying, and medication caused the suicide attempt.  (Tr. 67, 69, 76, 78-79.)

He saw Dr. Simon for psychiatric treatment and attended an outpatient program for three or four months in 2009 and 2010.  He attended three or four times per week in eight-hour intervals and met with Dr. Simon for thirty minutes once per week.  In group therapy, he discussed self-esteem and emotions.  At the outpatient program, he continued to have paranoid thoughts and hear voices daily.  The therapy groups of eight or nine people caused fear and nervousness.  A single person causes him some anxiety, except if he knows and trusts the person.  He continues to hear voices and compares them to the conversations at a busy restaurant.  When he is nervous, the voices warn him that someone will kill him.  Medication did not silence the voices.  He took Seroquel during the outpatient program, which he found ineffective.  Seroquel caused anger episodes involving punching walls, which scared his wife.  (Tr. 68-69, 74-77.)

Groups of people surrounding him causes nervousness, panic, and the loss of the ability to function.  People approaching him causes him to believe that they are "after him."  He meets with his grandparents three or four times per week.  He sees his mother-in-law about three times per week.  He visits friends daily at their houses, where they barbecue and watch movies.  He attends church three times per month but sits in the back. He struggles with concentration and cannot remain focused on conversations.  (Tr. 70-71.)

His back pain feels like a knife slicing his back.  Afterwards, the pain becomes dull and then feels like needles piercing his spine.  The hand pain feels like needles constantly stabbing his fingers.  The elbow pain is dull and aching.  His feels pressure on his knee joints.  He experiences pain daily for about twelve hours per day.  Physical activity exacerbates his pain but soaking in hot water alleviates it.  He can lift about forty pounds

without causing further injury. For an eight-hour time period, he could walk about four hours, stand for two hours, and sit for about one hour with a sit/stand option. He drives. (Tr. 71-73.)

Vocational expert (VE) Mark Anderson also testified at the hearing. Plaintiff previously worked as a production assembler, which is unskilled, light work; and as a cleaner, which is unskilled, heavy work.

The ALJ asked the VE to assume the truth of plaintiff's allegations. The VE responded that plaintiff could perform no work due to his nervousness around people, his difficulty concentrating, anxiety, and the voices he hears. The VE also stated that, typically, after a probationary period, employers tolerate missing two days of work per month. Missing three days of work per month results in a warrant and continually missing three days results in termination. Maintenance of a competitive production standard requires employees to remain on task ninety percent of the time that an employee is not on break. (Tr. 79-81.)

### III. DECISION OF THE ALJ

On September 7, 2011, the ALJ issued a decision that plaintiff was not disabled. (Tr. 32-46.) At Step One of the prescribed regulatory decision-making scheme,[13] the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date, February 1, 2009. At Step Two, the ALJ found that plaintiff's severe impairments included bipolar disorder, posttraumatic stress disorder, borderline intellectual functioning, and schizotypal personality disorder. (Tr. 34.)

At Step Three, the ALJ found that plaintiff had no impairment or combination of impairments that met or was the medical equivalent of an impairment on the Commissioner's list of presumptively disabling impairments. (Tr. 37.)

The ALJ considered the record and found that plaintiff had the residual functional capacity (RFC) to perform the full range of work, except that he has the following non-

---
[13] See below for explanation.

exertional limitations: he is limited to simple, unskilled tasks with no more than occasional interaction with supervisors, coworkers, or the general public. At Step Four, the ALJ found plaintiff capable of performing past relevant work as a production assembler or cleaner. (Tr. 39-46.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If

the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform his past relevant work (PRW). Id. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating he is no longer able to return to his PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## V. DISCUSSION

Plaintiff argues that the ALJ erred by (1) failing to properly assess the credibility of plaintiff's subjective complaints, (2) failing to properly analyze plaintiff's physical impairments and the limitations arising from them, and (3) failing to properly determine plaintiff's RFC.

**1. Credibility**

Plaintiff argues that the ALJ failed to properly assess plaintiff's credibility by not making an express determination and by failing to consider support from the record.

To evaluate a claimant's subjective complaints, the ALJ must consider the Polaski[14] factors: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the condition; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions." Wildman v. Astrue, 596 F.3d 959, 968 (8th Cir. 2010). The ALJ must acknowledge and consider these factors but "need not explicitly discuss each Polaski factor." Id. The ALJ may also consider inconsistencies in the record as a whole. Id. "[Courts] defer to an ALJ's credibility

---

[14] Polaski v. Heckler, 739 F.2d 1320, 1321-22 (8th Cir. 1984).

finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so." Id.

As an initial matter, plaintiff fails to identify the specific testimony that the ALJ allegedly improperly discredited. Although plaintiff lists specific testimonial statements regarding his psychiatric condition and treatment, the record indicates that the ALJ did not discount these testimonial statements but only the general allegation that his mental impairments prevented him from employment. To support discrediting this allegation, the ALJ discussed several of the Polaski factors.

The ALJ discussed plaintiff's daily living activities, including his caring for his infant daughter, performing household chores, yard work, personal care, meal preparation, board games, visits with his friends and family on a regular basis, watching movies, dining at restaurants, working, driving, using public transportation, fishing, walking, and hunting. (Tr. 44-45.) The record contains evidence that plaintiff performed each of these activities. (Tr. 65-67, 73, 205-06, 224-25.) The ALJ also discussed plaintiff's medication. (Tr. 45.) Plaintiff received medication from Dr. Foxen and reported that he stopped hearing voices. (Tr. 295-302, 310-12.) On May 26, 2010, plaintiff's medications consisted solely of Tylenol, and plaintiff denied hallucinations and suicidal ideation. (Tr. 452-54.) On October 25, 2010, plaintiff took no medication for his mental condition, and Dr. Foxen found no unusual anxiety or evidence of depression. (Tr. 480-82.) The ALJ also considered plaintiff's functional restrictions. (Tr. 45.) Dr. Simon indicated that plaintiff had no history of aggressive behaviors, memory impairment, or general cognitive impairment. (Tr. 375.) He also considered Dr. MacDonald's assessment of plaintiff's functional restrictions. (Tr. 501-03.) Further, Dr. Simon considered that plaintiff might be malingering. (Tr. 382.) The ALJ also noted that the record contains few complaints regarding his mental condition after he attended therapy. (Tr. 45.) In sum, the ALJ sufficiently discussed the credibility of plaintiff's allegations regarding the severity of his mental conditions, and substantial evidence supports the decision.

## 2. Plaintiff's Physical Impairments

Plaintiff also refers generally to his testimony regarding his physical impairments. The ALJ found plaintiff's arthritis not severe and discounted plaintiff's allegations regarding its effect on standing, walking, sitting, lifting and carrying. (Tr. 35.) The ALJ discussed several Polaski factors to discount plaintiff's allegations regarding his physical impairments. "[A]cts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain." Medhaug v. Astrue, 578 F.3d 805, 817 (8th Cir. 2009).

The ALJ discussed many of the daily living activities mentioned above. (Tr. 35.) Additionally, the ALJ noted that plaintiff and his spouse indicated that plaintiff's conditions did not affect his ability to lift, squat, bend, stand, reach, walk, sit, kneel, or climb stairs. (Tr. 207, 226.) Additionally, plaintiff testified that, although his medication partially alleviated his pain, he did not take it as prescribed. (Tr. 64.) The ALJ also considered the medical record but found no evidence that arthritis more than minimally affected plaintiff's ability to perform physical activities. (Tr. 35-37.)

Accordingly, the ALJ sufficiently discussed reasons for discounting plaintiff's allegations regarding his mental and physical condition, and substantial evidence supported his decision to do so.

## 3. RFC determination

Plaintiff argues that substantial evidence does not support the RFC determination. Residual functional capacity is the ability of a claimant "to do the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Wilcutts v. Apfel, 143 F.3d 1134, 1137 (8th Cir. 1998). Residual functional capacity is a medical determination. Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). Some medical evidence must support the RFC determination. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

The evidence that supports the ALJ's decision to discredit plaintiff's allegations regarding his mental condition and physical condition also supports the RFC determination with respect to plaintiff's mental and physical limitations. Further, no medical opinion in the record states that plaintiff's RFC is more limited than the ALJ found.

Plaintiff argues that the ALJ erred by failing to seek clarification on the Medical Source Statement of Ability to Do Work-Related Activities (Mental) form submitted by Dr. MacDonald. On the form, Dr. MacDonald indicated that plaintiff's impairments affected his ability to interact appropriately with supervisors, coworkers, and the public and his ability to respond to changes in routine work settings due to homicidal and suicidal thoughts, anger outbursts, and auditory and visual hallucinations. (Tr. 502.) However, she did not evaluate the degree of such restrictions as "none," "mild," "moderate," "marked," or "extreme", although such checkboxes appeared on the form. (Id.)

"A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record." Smith v. Barnhart, 435 F.3d 926, 930 (8th Cir. 2006). It is reversible error for an ALJ not to order a consultative examination when such evaluation is necessary for him to make an informed decision. Haley v. Massanari, 258 F.3d 742, 749 (8th Cir. 2001). "An ALJ is required to obtain additional medical evidence if the existing medical evidence is not a sufficient basis for a decision. But an ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994); Tellez v. Barnhart, 403 F.3d 953, 956-57 (8th Cir. 2005).

Here, the record includes plaintiff's testimony at the ALJ hearing, function reports from plaintiff and his spouse, his school records, his mental health treatment records, and the psychological evaluation of Dr. MacDonald. Therefore, evidence from the record

provides a sufficient basis for the RFC determination regarding plaintiff's mental limitations.

Plaintiff further characterizes the ALJ's determination regarding the severity of ability to interact appropriately with supervisors, coworkers, and the public and his ability to respond to changes in routine work settings as the ALJ formulating a medical opinion. "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings." Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996). Courts find that ALJs "play doctor" when the ALJ substitutes his judgment for those of medical professionals or makes findings wholly unsupported the record. See e.g., Easter v. Bowen, 867 F.2d 1128, 1131 (8th Cir. 1989); Pate-Fires v. Astrue, 564 F.3d 935, 946-47 (8th Cir. 2009). Here, however, no medical professional in the record indicated that plaintiff's RFC is more limited, and, as stated above, the record supports the ALJ's findings.

## VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.

/S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on September 12, 2013.